Lessee of ROBERT MORRIS *against* WILLIAM NEIGHMAN.

Same *against* ADAM SHEINER.

[S. C. 4 Dall. 209.]

Settlements to be made of lands under the act of 3d April 1792, commence from 22d December 1795. Where a settlement has been prevented by Indian hostilities, the state alone can take advantage of forfeitures for non-settlement by granting new warrants.

THE plaintiff claimed the lands in question on the water of Big Con-equanesing creek, under two warrants, dated 4th March 1793, in the names of Emanuel Reigart and Michael App, and surveys made thereon, on the 12th and 19th November 1794, by Stephen Gaphen, deputy surveyor of District No. 8, and conveyances from the warrantees in the month of December following.

It appeared in evidence, that when these surveys with many others were made for the lessor of the plaintiff, there had been erected on all the tracts seven small cabins by persons who intended thereby to hold the lands ; and the agent of the plaintiff, to preclude dispute, had bought from different claimants for 110 dollars. On the 25th July, 1796, the agent took out a mill wright to build a mill on the land then occupied by Neighman, and demanded the possession thereof. The latter permitted him to level the water, but would not suffer him to do other work, as he insisted that the plaintiff's warrants were dead, for defect of settlements within the two years. At this time, Neighman had a small cabin, and about one acre of timber deadened, but had no family on the ground. On the 1st March 1797, this defendant settled with his family on the land, and before the bringing of the ejectment, had built a large cabin 16 feet by 18, and a barn, cleared 10 acres of land and had begun to make the dam and forebay of his mill, which he afterwards completed.

Sheiner the other defendant came with his family on the other tract of land on the 8th April 1797, under Neighman, who was bound to make him a good title to one moiety thereof.—Just as he was beginning to work, one Jacob Rudolph, a tenant who had accepted a lease under Morris, warned him off ; but he refused going, and would not permit Rudolph to take possession.

It further appeared, that in 1793 and 1794, no settlements were made across the rivers Ohio and Alleghany. Early in March 1795 a few individuals removed, without their families, to the vicinity of fort Franklin Cussewago and Craig's station, but none settled at a distance or detached from the garrisons. Some of the white people in the spring of 1795, fired on the Indians ; this incited them to make reprisals, and they accordingly in the same spring killed two persons near Cussewago, on

French creek. It was totally unsafe to remove families into the interior of the country until 1796, when settlements in general took place.

Two questions were made. 1st. Whether the lessor of the plaintiff forfeited his right under the warrants, by not making his settlements on the lands within the two years ? 2d. Whether if a forfeiture was incurred, the defendants might not enter, and the condition being broken, take advantage thereof ?

These points were fully and ingeniously argued by Messrs. Brackenridge and Young for the defendants, and by Mr. J. Ross for the plaintiff. The court after stating the evidence at large to the jury, delivered their sentiments to the following effect.

These causes are said to involve extensive interests, and the magnitude of the case demands peculiar attention.

The solution of the questions which have been agitated, depends more immediately on the 9th section of the law passed on the 3d April 1792. 3 Dall. St. Laws, 212.

The act appears to be the result of a spirit of compromise, between the advocates of actual settlements, and warrant rights. The only distinction between them, is made in the 5th section, which declares, that " lands actually settled and improved, *prior* to the date of the entry of a warrant with the deputy surveyor of the district, shall not by virtue of such warrant be surveyed, except for the owner of such settlement and improvement." This is confessedly a great preference. For if the particular lands were actually vacant and unimproved, when the warrant issued, a subsequent settlement and improvement made the day before its entry with the deputy surveyor, shall postpone the warrant right.

The ninth section prescribes the terms on which warrants, and surveys shall vest a title to lands lying north and west of the rivers Ohio and Alleghany, and Conewango creek. " The grantee shall within two years after the date of the warrant, make, or cause to be made, an actual settlement thereon, by clearing, fencing and cultivating at least two acres for every hundred acres contained in one survey, erecting thereon a messuage for the habitation of man and residing or causing a family to reside thereon, for the space of five years next following his first settling of the same, if he or she shall so long live. In default whereof," &c. But it is provided in a subsequent clause, that " if any such actual settler, or grantee in any warrant, shall by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid, then in either case,

he and his heirs shall be entitled to have and hold the said lands, in the same manner as if the actual settlement had been made and continued.

It is a matter of public notoriety, that a war subsisted between the citizens of the United States and the western Indians, from 1790 until 1796.   The expedition of General Harmer into the Indian territories, took place in 1790, which was succeeded by that of General St. Clair, who was defeated on the 5th November 1791.   These are the facts which cannot be forgotten by the people on the frontiers.   The sum of 4000*l.* was appropriated for the defence of the western frontiers of this commonwealth, " in imminent danger of being invaded by the indian tribes, then at war with the United States," by an act passed 17th March 1791. 3 Dall. St. Laws, 19.   The same language is spoken in the preamble of another act passed 20th January 1792, *Ib.* 177 ; and the Governor was thereby impowered to engage three companies of rifle men to protect and defend the western frontiers, 4500*l.* were appropriated for that purpose.   The same provisions were made by another act passed on 3d April 1793, *Ib.* 335, and 14000 dollars allowed. Three infantry companies were to be raised and stationed for the protection of the frontiers of the counties of Westmoreland, Washington and Alleghany, by a law of 28th February 1794, *Ib.* 463, and 130 men were to be enlisted by another law passed 23d September 1794. *Ib.* 640.—See also 3 St. Laws, 483. *Ib.* 757, 763, §§ 1, 13, 14. These different public acts comport with the oral testimony given in the course of the trials.   Until 1796, it was unsafe for families to cross the rivers into the newly granted lands.   In 1795, some few bold adventurous persons settled in the spring, near the garrisons, yet no families removed thither with women and children.   Indictments for robbery uniformly charge, that the party robbed was put in fear ; and if the fact be attended with those circumstances of violence or terror, which in common experience, are likely to induce a man to part with his property, for the safety of his person, it will amount to a robbery. The law will presume fear, where there is a just ground for it.  Fost. 128.   The same principle applies to the section of the law under consideration.   For though the act certainly contemplated a settlement of the country within a period not remote, it provides for persons prevented from making such settlements, by force of arms of the enemies of the United States."   It cannot reasonably be taken to be the will of the community, these settlements should be made under imminent, impending danger, at a distance from the garrisons, or where there was just ground to fear such danger.   The war continued in fact until the

treaty was concluded at fort Greenville on the 3d August 1795, between General Wayne and the Indian tribes ; and peace with them could not be said to be established, until the treaty was ratified by the president and senate of the United States, on the 22nd day of December 1795. Here then is a safe rule to go by, freed from all damages of introducing perjury. The *terminus a quo* settlements shall commence, may safely be dated from the constitutional ratification of the Greenville treaty with the Indian nations ; and if after that period actual settlers or grantees " shall *persist* in their endeavors " to make their settlements, they shall not incur a forfeiture of their lands. This we take to be the true meaning and spirit of the law.

But granting for argument sake, that forfeitures were incurred by reason of non-settlemnt for two years after the date of the warrants, who shall enter for the condition broken ? The words of the law in the 9th section, are freed from all doubt and difficulty on this head. " In default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth, to issue new warrants to other actual settlers for the said lands, or any part thereof, reciting the original warrants, and that actual settlement and residence have not been made in pursuance thereof ; and so, as often as defaults shall be made for the time, and in the manner aforesaid ; which new grants shall be under and subject to all and every the regulations contained in this act. "

The new warrants, issued under proper circumstances, operate as inquests of office to divest the former estates granted ; and no individuals can take advantage of the breach of the condition, unless through the instrumentality of the state, by granting new warrants in a specified form. This method of procedure is obviously pointed out by the legislature, to avoid the mischiefs necessarily attendant on private persons assuming upon themselves to determine, when the estates of the persons settling, or obtaining warrants, should cease and become void. And least of all, ought those persons to have the advantage of forfeitures, if they really took place, who by their own acts and mere wills, prevented a compliance with the terms enjoined by the law, on the part of those who were desirous of settling and improving, and had fully paid for the lands. If the expressions of the law were not as particular as we find them, we should have no difficulty in pronouncing, that no persons should take advantage of their own wrong ; and that it does not lie in the mouths of men like the present defendants to say, " the war-

rants are dead ; we will take and withold the possession, and thereby entitle ourselves to reap benefits from an unlawful act."

We are nevertheless, pleased to find, that the plaintiff's attorney has engaged to pay for any real improvements which Neighman may have made, beyond the amount of his expenditures for the recovery, or to suffer him to remove his mill-works. But independent thereof, we are bound to say, that on both the questions which have been made, the plaintiff is entitled to verdicts.

Verdicts <em>pro quer</em>.