# Patterson *versus* Ross.

1. A warrant must be judged of by what appears on its face when compared with the locality; and whether it locates precisely the lands in question can be determined by testimony ascertaining the situation of the lands and of the natural or artificial boundaries mentioned in the warrant.

2. Where by any reasonable inferences which may be drawn from the evidence, the matters of description mentioned in the warrant can be so applied as to fix the identity of the land, it is for the jury to determine whether the warrant is sufficiently descriptive to cover the land in question; but if there be no evidence by which the descriptive parts of the warrant can be applied to the land in controversy, it would be error in the Court to refer it to the jury to say whether the description was vague or precise.

3. A warrant, dated 3d April, 1792, issued for 400 acres of land lying "north and west of the rivers Ohio and Allegheny and Conewango creek, on the west bank of Big Beaver creek, and to include the walnut bottom lying on the run that falls into said creek, nearly opposite an island between the Big and Little Falls, by estimation one mile above the Block House:" It being found from the evidence impossible to locate the "walnut bottom" so as to be included in an extent of 400 acres, the land which might have answered that description equally well being large enough to contain several tracts of that size, it was *Held*, that the warrant was not *descriptive*.

4. The jury were directed that if they found that a settlement had been commenced in 1792, on land north and west of the Ohio and Allegheny and Conewango creek, they might inquire whether it was perfected within a reasonable time by an actual residence upon the land; and that in determining this they might take into consideration the state of the country as to danger or otherwise from the Indians, the fact (if sufficiently proved) that the settler was *in the service of his country*, and the state of his health between the date of his first entry and of his actual residence in 1796: *Held*, that the instruction was proper.

5. It having been decided that until the ratification, in December, 1795, of the treaty between General Wayne and the Indians in August, 1795, it was dangerous to settle lands under the Act of 3d April, 1792, in pursuance of a *warrant: Held*, that this rule was applicable to the case of an actual settler, who claimed as such and who began an improvement in 1792; and that his return to the land, for the purpose of residence, in February, 1796 was within a reasonable time.

ERROR to the Common Pleas of *Beaver county*.

This was an ejectment instituted on 24th May, 1837, by James Patterson *v.* Thomas Ross, Samuel Ross and others, for 150 acres of land or thereabouts, situate in Brighton township, Beaver county.

The plaintiff claimed the land in dispute, under a warrant to *Joseph* Williams, dated 3d April, 1792, "for 400 acres of land north and west of the rivers Ohio and Allegheny and Conewango creek, on the west bank of Big Beaver creek, and to include the Walnut Bottom lying on the run that falls into said creek nearly opposite an island between the Big and Little. Falls, by estimation one mile above the Block House."

The survey under this warrant was dated 3d April, 1794, and was returned on 10th August, 1795.

Extract from the return of the survey.—"The above is a draught of a tract of land surveyed on the 3d April, 1794, in pursuance of a warrant granted to Joseph Williams for 400 acres of land, dated the 3d day of April, 1792, situate north and west of the river Ohio, on the west bank of Big Beaver creek, including the Walnut Bottom lying on the run that falls into said creek, opposite a small island between the Big and Little Falls, by estimation one mile above the Block House, in District No. 10, in Allegheny county, called Walnut Bottom, containing 410 acres," &c.

On part of the plaintiff was further given in evidence a deed poll from Joseph Williams to Daniel Brodhead, dated 12th April, 1792; and it was further proved that James Patterson, the plaintiff, for a valuable consideration, became, by sundry conveyances, the owner of the title under the Joseph Williams warrant, and was, and, for a number of years, had been in possession of all the land included in the survey, except the land in controversy. There was also given in evidence the record of an ejectment—William Barker v. Samuel Ross, John Ross, et al., No. 22 of April Term, 1851, in the Court of Common Pleas of Beaver county, for 440 acres in Beaver county, and verdict for plaintiff and judgment thereon on 18th November, 1836.

On part of *the defendants* it was contended, first, that they were not within the lines of the said survey, and witnesses were called to show that the south-east corner of that warrant was about 59 perches north of the place where the plaintiff claimed it to be; that if the location contended for by the defendants was correct, then only about 30 acres of the land in dispute would be within the claim of the plaintiff.

But, in the second place, it was contended that the said warrant in the name of *Joseph* Williams was not sufficiently *descriptive* to give title *from its date;* and that if title existed under it, it did not commence till the survey under it in April, 1794, before which time, it was alleged on their part, the title under which they claimed commenced.

The defendants claimed under *William* Williams, who, it was alleged on their part, began an improvement on the land in dispute, in November, 1792.

On their part, *Thomas* Williams was examined. He said that William Williams was his brother; that William Williams was in possession of the land in 1796. His first improvement was in 1792, and he fetched his family down in 1796. A smart piece of ground fenced but not cleared. When I came down in May, he had commenced a new piece. * * * We came past where he made the first improvement; I heard the report of guns and felt timid. I saw a good part of ground fenced in. He had a good,

2 F 2

comfortable house, &c.  *  *  *  He was drafted.  I knew he was absent before General Wayne came to Legionville with his army. It was '94 or '95 he was drafted in; not certain which.  I can't say how long he was away.  He was drafted as a spy, and served his time."  *  *  *  Sold to Thomas Ross and Samuel Jackson.  *  *  * He said "four or five acres fenced in on the first improvement, but not all cleared.  The improvement he showed—four or five logs high; two or three years cut and put up.  They must have been cut in 1792."

It would have been a cabin if built out.  He said he went lower down in 1796, to make the clearing, on the south side of Walnut run.  He afterwards said "I believe it was three months he was drafted—a general draft."

Another witness, John Gordon, said he came to the neighborhood in October, 1795.  That he observed an improvement on the right as he came down—about seven or eight acres cleared; that he was at the raising of the house in 1796.

He further said, he took notice of the improvement in 1795. That "it appeared to be about a year old—the rest *at the foot of the hill* a great deal older.  The last had been cut more than a year.  William Williams claimed the ground, and also the house I helped him to raise."

Another witness, Geo. Harvey, in his deposition, stated that he knew William Williams; that he built early in 1796, and cleared and cultivated land; saw it first in 1795; saw no improvement, except a small cabin partly built; saw marks of improvement in 1795.  He said, "Williams was in bad health for two years before he moved on the land.  No improvement could be made on account of Indians."

On 21st May, 1804, an application was made by Ross and Jackson, vendees of William Williams, for a vacating warrant "for 400 acres of land, on the falls of Big Beaver creek," &c.  The application stated, that "said tract (or the upper half thereof) was surveyed in pursuance of a warrant granted to *Joseph* Williams, dated 3d April, 1792, and which said tract (or the lower half thereof) was surveyed in pursuance of a warrant granted to William Barker, being dated the 3d April, 1792, who hath not complied with the conditions of the said warrant, and the 9th section of the act of 3d April, 1792, whereof default has occurred."  This application was accompanied by an affidavit by Wm. Williams, that he, in November, 1792, made some improvement on the land by deadening some trees, and laying the foundation of a cabin; and that, in February, 1796, he built a cabin on it, and moved his family there on the 14th March following, &c.

*Thomas* Williams, in an affidavit accompanying the application, stated that William Williams moved his family on the land in

March, 1796, and has resided on it with his family since; that he built a cabin thereon; cleared about 16 acres; fenced and cultivated the same; and has raised grain every year, from the first year of his settlement. The year 1792 was not mentioned in it.

In another affidavit, by John Hill, the improvement in 1792 was not mentioned, but only that Williams settled on the tract in March, 1796.

On 4th April, 1807, a warrant issued to Ross and Jackson, in pursuance of said application, for 400 acres—surveyed 2d September, 1807, 400 acres and allowance, and returned 20th October, 1809. 19th February, 1811, patent to Ross and Jackson. The *defendants* also produced testimony in order to prove the alleged improvement in November, 1792, and a resident settlement on the tract, in the spring of 1796. But there was no evidence of any designation by William Williams in 1792, or at any time before 1796, of the bounds of his claim, by marks upon the ground. Also the *defendants* produced the testimony of surveyors and others, in order to show that the land in controversy was not included in the survey of the plaintiff, but that the plaintiff's survey had been shifted from the land called for in the Joseph Williams warrant; and also as *to the locality of the island*, of the Walnut Bottom run, of the Walnut Bottom, and of Patterson's and Pugh's dams; which dams, the plaintiff alleged, designated the *Big and Little Falls*.

The *plaintiff* gave rebutting testimony, by surveyors and other witnesses, for the purpose of showing that the land included in the survey of the Joseph Williams warrant, answered the calls in the warrant; that the warrant was not shifted, and that there were falls on the Beaver called the Big and Little Falls, and their locality— also the locality of the Walnut Bottom run, and of the Walnut Bottom, and of the island. Other testimony was given on both sides, as to the surveys, courses of the streams of water through the tract, &c. There was in evidence the books of the deputy-surveyor of Beaver county, containing a draft of a survey made for Robert McKinley, on the 24th November, 1793, for a tract adjoining the William Barker tract, and also of a survey made on the William Barker tract, on 4th April, 1794, which tract adjoined the tract of Joseph Williams, and also of a tract surveyed for Thomas Straten, on the 5th June, 1795, also adjoining the Joseph Williams tract, in order to prove that, between 1792 and 1796, no danger was apprehended in that part of the country from the Indians. The testimony of plaintiff and defendants conflicted.

On the trial, the plaintiff contended that the *Joseph* Williams warrant was sufficiently descriptive of the land it called for, to give title from its date. On the part of defendants, it was contended

[Patterson *v.* Ross.]

that the Joseph Williams warrant was indescriptive, loose, and vague, and only gave title from the date of survey. The Court charged the jury, as matter of law, that the said warrant was indescriptive, loose, or vague, and only gave title from the 3d of April, 1794, the date of the survey—thereby, it was said, taking that part of the case from the consideration of the jury. This instruction was the subject of the *first* assignment of error.

The plaintiff further contended that if the jury should find that the Joseph Williams warrant was not descriptive of the land, but was loose or vague, the title by survey under it, on the 3d April, 1794, had priority over that of defendants, because their application and accompanying affidavits showed that there was in fact no connexion, and that none was claimed at the time, between what was called the improvement of 1792, the girdling a few trees, as it was said, and putting up a few logs for a cabin, and the personal resident settlement of 1796. That the application of itself showed that it was not upon the improvement of 1792, but the settlement of 1796. That the improvement of 1792 was only mentioned in the application *for designation of the land,* not for title. That the application recognised title by virtue of the Williams warrant and survey, but alleged it was forfeited or lost because the warrant-holder had not complied with the provisions of the 9th section of Act of 3d April, 1792, which required the holder of a warrant, " within the space of *two years* next after the date of the same, to make or cause to be made an actual settlement therein, by clearing, fencing, and cultivating at least two acres for every hundred acres contained in one survey; erecting thereon a messuage for the habitation of man, and residing or causing a family to reside thereon, for the space of five years next following his first settling of the same."

The Court were requested, on part of the plaintiff, to charge as matter of law that William Williams's settlement was not made until after the date of the plaintiff's survey. The Court charged that, " Whether there is sufficient evidence to satisfy the jury that William Williams entered in 1792, with the present intention of making an immediate personal resident settlement; and if so, whether he perfected his settlement by actual residence within a reasonable time, we cannot say; but it would, in our opinion, be error for the Court to assume the negative of these propositions as matters of law." This answer was the subject of the *second* assignment of error.

On part of the plaintiffs it was also contended that *if* William Williams began to improve the tract in November, 1792, by girdling a few trees, and putting up three or four logs of a cabin, and did no more to indicate an intention to make upon it a personal resident settlement, but left it, and did not return till February, or in the

spring of 1796, his return in view of all the testimony was not within a reasonable time, and was, in law, an abandonment of his alleged improvement in 1792, and he could derive no title under it.  But the Court instructed the jury, "that, in determining the question whether or not the original entry was followed within a reasonable time by an actual residence, they might take into consideration the state of the country as to danger or otherwise from the Indians; the fact (if sufficiently proven) that the settler was in the service of his country, and the state of his health, between the date of his first entry and that of his actual residence in 1796." This was the subject of the *third* assignment of error.

The verdict of the jury was for the defendants.

*Cunningham* and *Fetterman*, for plaintiff in error.—It was contended that the warrant to *Joseph* Williams was a *descriptive* warrant, and that the question as to its character should have been submitted to the jury : cited 2 *Yeates* 244 ; 4 *W. C. C. R.* 74 ; 4 *Bin.* 58.  That whether or not it was descriptive was a question of fact for the jury: 3 *Bin.* 18 ; 7 *Ser. & R.* 187 ; 3 *Watts* 469 ; 2 *Yeates* 315 ; 2 *Id.* 149 ; 15 *Ser. & R.* 226 ; 6 *Id.* 134 ; 2 *Bin.* 66 ; 2 *Penna. Rep.* 401.

As to the *second* assignment.  It was contended that the application of Ross and Jackson was made under an impression that the title under the Joseph Williams warrant was forfeited by the warrant-holder not having fulfilled the condition prescribed in the 9th section of the Act of 1792, and that the tract was thereby open to settlement; also, that it was evident, from the application and the affidavits submitted with it, that the settlement relied on was begun in 1796, and that the improvement in 1792 was referred to for the mere purpose of designation, and not for title.  It was *not* stated in the application that the improvement of 1792 was begun with the view of acquiring title.  It was contended that applications and warrants must be judged of from what appears on their face : 1 *Yeates* 284 ; 2 *Id.* 244 ; 6 *Barr* 370 ; *Id.* 21.  In the application it was not stated that Williams does not state that his first improvement was continued.  The evidence was, that it was abandoned, as in 1796 he began an improvement *at a different place*, on another part of the tract : 6 *Barr* 21.  As to what constitutes a settlement, reference was made to 4 *Dallas* 162 ; *Id.* 366. If he was drafted, it was said it was but for three months, and did not excuse a delay of nearly four years.  Also, that the two witnesses, whose affidavits accompanied the application, do not refer to the improvement in 1792 ; and it was said that the law required that the settlement be proved by two witnesses.  It was said that the Court should have charged that the settlement was made in 1796 ; and that deadening some trees, and laying the foundation

[Patterson *v.* Ross.]

of a cabin, was not sufficient to give title. An improvement must not be abandoned: 2 *Watts* 410; 5 *Id.* 13; *Id.* 174.

Fear of the Indians did not prevent the deputy-surveyor from making a survey of the tract in dispute. Ill health did not account for it, as Harvey testified that Williams was in ill health for *two* years, whereas it was contended that there was a neglect of *four* years. It was said, that it was held that, by the terms of the Act of 1786, nothing will excuse a settler from continuing his residence on the land, except the public enemy, or being called into military service: 2 *Watts* 410; 5 *Watts* 13. In the Act of 1792, the exceptions are, prevention by the public enemy or by death; entering into the military service is there omitted. It was therefore contended that, if there was an abandonment by *William* Williams of his improvement of 1792, then his settlement was made in 1796, which was subsequent to the survey under the *Joseph* Williams warrant; from which time, it was alleged, if that warrant was not *descriptive*, the title under it vested.

*Purviance* and *Sullivan*, with whom were *Shannon* and *Chamberlin*, contrâ.—The defendants below, by the evidence of settlement, have fixed the time when William Williams made the entry, and his intent in making it; and it was said that, the settlement being in advance of the survey on the warrant, the title attached, unless by the absence of the settler it was lost: 3 *Yeates* 280; 2 *Id.* 430; 1 *Bin.* 166. It was said that William Williams was on the land in 1792; and, it was contended, also in 1794 and 1796. It was said that the jury have found that he was on the land from 1792 to 1794. That his brother testified that he was drafted in 1794; and it was said that the improvement he made before he left was evidence of his having been upon the land between 1792 and 1794. Absence may be accounted for: 2 *Harris* 253; 4 *Id.* 315; 1 *Id.* 468; 2 *Watts* 409; 1 *Watts* 46; 4 *Yeates* 330. Why should not a *settler* have the length of time allowed to a warrant-holder before abandonment is to be presumed? (Two years after the pacification of Wayne's treaty, which was made at Meadville on 3d August, 1795 and ratified on 23d December following, is a reasonable time for making a settlement which has been prevented by the enemy: Hazard's Lessee *v.* Lowry, 1 *Bin.* 166.)

The title by improvement commences with the girdling of the first tree; and if a delay ensues, it may be accounted for in a reasonable manner: 4 *Yeates* 562; 2 *Bin.* 127. It was said that, in the case of Hazard's Lessee *v.* Lowry, 1 *Bin.* 171, Judge TILGHMAN said, "It is notorious that for more than two years from 13th April, 1792, there was open war with the Indians, which rendered it dangerous to attempt a settlement of the land in dispute."

It was further contended that the warrant of *Joseph* Williams was not descriptive, so as to give title from its date. It was said

[Patterson v. Ross.]

that at that date *Walnut Bottom run* was unknown except to the surveyor.    That if the run were fixed, it was necessary to find *the bottom*.    The bottom extends for miles along the run.    If the whole bottom were included, what shape would it give the survey, and where would it start on Big Beaver creek?    It was said that one tract after another above this warrant includes Walnut Bottom, on the run.    It was said that this warrant might have been located ten miles above where it was located, if, by extending it back, Walnut Bottom could have been included; for that stream runs, to some extent, in nearly the same direction with the Big Beaver; and it might not thus interfere with the description, nor with the fact of Walnut Bottom run falling into Big Beaver opposite an island, between Big and Little Falls, by estimation a mile from the Block House.    It was said that by beginning at any point at the head or foot of the island, and embracing land on the run so as to include 400 acres, the vague character of the description was unquestionable.    That there is Walnut Bottom land extending far up this run.    There is no starting point fixed in the warrant.    That the Falls extend perhaps three miles up Beaver creek.

The opinion of the Court was delivered by

Knox, J.—The Joseph Williams warrant, upon which the plaintiff's title was based, bears date the 3d April, A. D. 1792, and is for four hundred acres of land north and west of the rivers Ohio and Allegheny, and Conewango creek, on the west bank of Big Beaver creek, and to include the walnut bottom lying on the run that falls into said creek nearly opposite an island between the Big and Little Falls, by estimation one mile above the Block House.

It was contended, upon the trial, that this was a descriptive warrant, and that the title commenced from its date.    The Court instructed the jury that the description was a loose or vague one; and that the title dated from the survey, which was on the 3d of April, 1794, two years subsequent to the date of the warrant.

This instruction as to the character of the warrant is assigned for error, upon the ground that it was for the jury to say whether the warrant was precisely descriptive or not.

A warrant must must be judged by what appears upon its face, when compared with the locality; and whether it locates precisely the lands in question, can only be determined by testimony ascertaining the situation of the lands and of the natural or artificial boundaries mentioned in the warrant: Norris v. Monen, 3 *Watts* 465.    Where by any reasonable inferences which may be drawn from the evidence, the matters of description mentioned in the warrant can be so applied as to fix the identity of the land, it is for the jury to determine whether the warrant is sufficiently descriptive to cover the land in question; but if there is no evidence

[Patterson *v.* Ross.]

by which the descriptive parts of the warrant can be applied to the land in controversy, it would be error in the Court to refer it to the jury to say whether the description was vague or precise.

Where there is no evidence in a cause from which a jury would be authorized to find the existence of a fact, the Court must presume its non-existence.

The matters of description embraced in the Williams warrant, are, 1st. That the 400 acres of land should lie upon the west bank of the Big Beaver creek.

2d. That the walnut bottom lying on the run that falls into said creek opposite a small island between the Big and Little Falls, by estimation one mile above the Block House, should be included.

Upon an examination of the ground upon the west bank of the Big Beaver creek, a run is found falling into the creek near the point mentioned in the warrant; and along the run for some miles up the creek is found bottom land, but no portion of it more than any other designated as "Walnut Bottom." The run is laid down upon the original survey as "Buck run;" when its name was changed to "Walnut Bottom run," was not shown. It was impossible from the evidence to locate the "Walnut Bottom" which the warrant called for; and without this it was in vain to call the warrant a descriptive one. Several warrants of four hundred acres each might have been located upon ground that would have answered the description equally as well as the land embraced in the Joseph Williams survey.

In the absence of evidence tending to connect the description in the warrant with the land actually surveyed upon it, the judge was right in saying that, in point of time, the title commenced with the survey.

The defendants claimed under an actual settlement made by one William Williams, and which they alleged was commenced as early as November, A. D. 1792.

This was denied by the plaintiff, and the Court was requested to instruct the jury that there was no evidence that the settlement began anterior to the survey. The refusal to charge as requested is the second error assigned.

Thomas Williams, the brother of William, testified that the improvement was commenced in 1792, and that after it was so commenced his brother was drafted as an Indian spy and served his time. That he returned to the land with his family in 1796, continued his improvements, and remained there until he sold to Ross and Jackson.

John Gordon saw the improvement in 1795, and says that it appeared to be about a year old, and *that* at the foot of the hill a great deal older.

George Harvey in his deposition stated, that in 1795, he saw a

[Patterson *v.* Ross.]

small cabin partly built on the land, and marks of an improvement; and that in 1796 Williams built a cabin, cleared and cultivated land, and remained on it until the witness left the country. He also stated that Williams was in bad health for two years before he moved on the land, and that no improvement could be made on account of the Indians.

To the application made by Ross and Jackson for a vacating warrant, given in evidence by the plaintiffs, an affidavit of Wm. Williams is appended, made on the 21st day of May, 1804, which stated "that he, this deponent, in the month of November, 1792, and not before, made some improvement on the above described tract of land applied for, by deadening some trees and laying the foundation of a cabin, and that in the month of February, 1796, he built a cabin on said tract, twenty by twenty, and moved his family there on the 14th of March following, and that he has resided on said tract from that time until the present date; and further, that he has cleared at least sixteen acres of land, fenced and cultivated the same on said tract, and that no other settlement has ever been made by Jos. Williams or Barker, or by any person for them, and further saith not."

Upon this and the accompanying affidavits the land office, in issuing a warrant to Ross and Jackson, charged interest on the purchase-money from 1792.

Whether this evidence was sufficient to justify the jury in finding "that Williams entered in 1792 with the present intention of making an immediate, actual resident settlement, and that he gave evidence of such intention by some notorious act of dominion upon the land," is not for us to determine. Clearly there was evidence for the jury, and there is no complaint that it was not submitted under proper terms, and with the necessary restrictions and qualifications.

If the jury found that Williams had commenced a settlement in 1792, they were directed to inquire whether it was perfected within a reasonable time by an actual residence upon the land; and were told, that in determining this "they might take into consideration the state of the country as to danger, or otherwise, from the Indians, the fact (if sufficiently proved) that the settler was in the service of his country, and the state of his health between the date of his first entry and that of his actual residence in 1796."

The complaint against this portion of the charge is not sustained by previous adjudications of this Court. The rule laid down by Chief Justice TILGHMAN at an early day, has never been departed from. In Wright *v.* Small, 4 *Yeates* 562, it is stated thus: "If an improvement is begun with an intent to make an immediate settlement, and prosecuted with due diligence till a settlement is completed, the title relates to the commencement of the improve-

2 G

[Patterson *v.* Ross.]

ment.   It is essential that there should be an intention of imme-
diate settlement.

"If a small improvement is commenced, and considerable delay
takes place before there is any residence, it lies on the improver to
account for it in a reasonable manner.   Much will depend on the
situation of the country with respect to danger from an enemy,
the difficulty or facility of procuring provisions, the health of the
improver and his family, and a variety of circumstances which
must be judged of as they are brought forward."

Again, in Cosby *v.* The Lessee of Brown, 2 *Bin.* 127, the same
distinguished and eminent jurist says, "A liberal allowance is
made for a man who has evinced a *bonâ fide* intention to settle.
Danger from an enemy, the death or sickness of the party or his
family, the difficulty of procuring provisions, and a variety of other
circumstances, are to be taken into consideration."

The absence of Williams from the land was at the furthest but
a little more than three years, and this was accounted for, if the
defendant's witnesses were believed, by showing that a portion of
the time he was in the service of his country as an Indian spy; also
was in bad health, and that there was danger to be apprehended
from the Indians on the frontier.   The treaty made between Gene-
ral Wayne and the Indians at Fort Greenville, in August, 1795,
was not ratified by the President and Senate of the United States
until the 22d day of December, 1795.   Up to this period, it has
been judicially determined that it was unsafe and dangerous to
settle lands under the Act of 3d of April, 1792: 2 *Yeates* 450; 1
*Binn.* 170.   This rule was applied in favor of a warrant-holder,
to excuse an actual settlement within the two years required by the
statute.   I can see no good reason why it should not be applied to
the case of one who had commenced an actual settlement which he
was compelled for a while to postpone.   An actual settler should
be placed at least upon a footing of equality with one who pur-
chases for the profit to be made by a resale.

If then the law fixed the 22d of December, 1795, as the earliest
day when Williams's settlement could have been renewed with
safety, there was little room for the jury to say that February
1796 was not a reasonable time for his return to the land with
his family.

The errors assigned are not sustained.

Judgment affirmed.

BLACK, C. J., dissented, considering that the warrant in the
name of Joseph Williams was *descriptive*, and that its character
should have been submitted to the jury.

WOODWARD, J., concurred in the dissent of BLACK, C. J.